UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

KADAFI ALA (aka Phillip Almeda)

                                        Plaintiff,

                     -against-

CITY OF NEW YORK, SERGEANT CHARLES
BROUGHTON, POLICE OFFICER PATRICK
COWARD, DETECTIVE SIDNEY STROBERT,
POLICE OFFICER WILLIAM O'BRIEN,

                                        Defendants.

------------------------------------------------------------------------ x

COMPLAINT AND JURY DEMAND

24CV4047

## PRELIMINARY STATEMENT

1. Plaintiff Kadafi Ala spent 18 years incarcerated for a crime he did not commit. In June 2021, the Kings County District Attorney moved to have the conviction vacated and the indictment dismissed because there was no credible reliable evidence of Mr. Ala's guilt.

2. This injustice was not an accident but resulted from a series of intentional acts by the individual defendants, outlined herein, with participation and knowing approval of supervisors up the chain of command, and as a direct consequence of unconstitutional policies, practices and customs maintained by the City of New York.

3. This is a civil rights action in which plaintiff seeks relief through 42 U.S.C. §1983 for the violation of his Fifth, Sixth and Fourteenth Amendment rights. The claim arises from a December 31, 1999 incident in which Officers of the New York City Police Department ("NYPD"), acting under color of state law, intentionally and willfully denied plaintiff due process and subjected plaintiff to, among other things, malicious

prosecution.

4. Plaintiff seeks monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

5. This action arises under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §1983 and §1988.

6. The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a) and the doctrine of pendent jurisdiction.

## VENUE

7. Venue is laid within the Eastern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claim occurred within the boundaries of the Eastern District.

## PARTIES

8. Plaintiff currently resides in Pennsylvania. During the events underlying this claim, plaintiff resided in Kings County, City and State of New York.

9. The City of New York ("City") is a municipal corporation organized under the laws of the State of New York. At all times relevant hereto, Defendant City, acting through the New York Police Department (or "NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD

personnel obey the laws of the United States and the State of New York.

10. Defendant police officers were, at all times here relevant, police officers of the NYPD, and as such were acting in the capacity of agents, servants and employees of the City of New York.

11. At all times relevant hereto, defendant officers were involved in the decision to arrest and initiate a criminal prosecution against plaintiff without probable cause or failed to intervene in the actions of their fellow officers when they observed them arresting and prosecuting plaintiff without probable cause.

12. The defendant officers were involved in denying plaintiff due process or failed to intervene in the actions of their fellow officers when they observed them denying plaintiff due process.

13. On information and belief, at all times relevant hereto, defendant officers were under the command of the 77th Precinct Anti-Crime Unit and are sued in their individual capacity.

14. At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

OVERVIEW

15. On December 31, 1999, plaintiff, his brother, and several friends were gathered at the home of Charles Donovan at 1320 Eastern Parkway in Brooklyn to celebrate New Year's Eve. Just before midnight, the group came outside to watch the fireworks. Around the same time, a man walked up the block, stopped near 1320 Eastern Parkway and fired several shots from his firearm into the air.

16. The defendant officers were driving on Eastern Parkway and saw the man firing shots into the air. The four officers got out of their car and came toward the building. The shooter ran into 1320 Eastern Parkway, firing a few more shots on his way into the building. Plaintiff was on the sidewalk when the initial shooter fired into the air.

17. The building at 1320 Eastern Parkway is a four-story private home. The front door is on the left when facing the house. The front yard was divided into two fenced sections on the left and right sides. A walkway ran between these two fenced sections from the sidewalk toward the front of the building. A concrete wall with fencing on top, approximately 4 feet 11 inches high, ran along the sidewalk side of the yard with a gate leading to the walkway.

18. The police officers stopped on the sidewalk and spread out along the concrete wall that lined the front of the property. Three of the officers began firing toward the building and into the yard. Plaintiff remained on the sidewalk after the officers ran past him.

19. When the officers finally stopped shooting, many individuals were arrested, including several from inside the home and several from the sidewalk. The plaintiff was one of the individuals arrested. Everyone was taken to the precinct.

20. Eventually, the officers decided to release everyone except plaintiff and another individual. Plaintiff was charged with Attempted Murder, Assault in the 1st Degree and related charges under the officers' fabricated theory that plaintiff was a second shooter firing at officers from inside the front yard after the initial shooter retreated into the building.

21. Plaintiff refused to accept a plea bargain and has always maintained his

innocence. Plaintiff was never in the front yard of 1320 Eastern Parkway and he never possessed or fired a gun that night. Plaintiff also passed a polygraph test.

22. Plaintiff went to trial and was convicted based solely on the testimony of the defendant officers. Civilian witnesses and ballistic evidence all supported the plaintiff's claim of innocence. There was no confession, no forensic evidence pointing to plaintiff, no video footage and no witnesses, other than the defendants, who pointed to plaintiff as a shooter. Plaintiff was convicted of three counts of Attempted Aggravated Assault on a Police Officer (Penal Law §110/120.11) and was sentenced to 7 years of incarceration on each count to run consecutively.

23. Plaintiff served approximately 18 years in prison before being released under post release supervision in 2018. Still maintaining his innocence, his case was thoroughly analyzed by the Kings County District Attorney's Conviction Review Unit. On June 30, 2021, by motion of the People, his conviction was vacated and the indictment dismissed. The District Attorney found the officers' testimony against the plaintiff lacked veracity and that there was no credible evidence of guilt.

<u>DEFENDANTS' FABRICATIONS THAT LED TO THE CONVICTION OF AN INNOCENT MAN</u>

24. The defendant officers maliciously and repeatedly fabricated evidence, lied to prosecutors, the grand jurors and the petit jurors and hid evidence of plaintiff's innocence. Although not an exhaustive list, these are some specific examples of defendants' fabrications that were communicated to NYPD investigators, prosecuting officials and jurors.

**A. A Second Shooter**

25. The defendants and the witnesses all agree that the person initially shooting into

the air was not plaintiff.  Plaintiff's arrest, prosecution, indictment and conviction relies entirely on the defendant officers' creation of a second shooter in the yard of 1320 Eastern Parkway.  In statements to NYPD investigators, the District Attorney, the Grand jury and ultimately at trial, the defendants falsely claim that after the initial shooter retreated into the building, a second man began firing from inside the front yard.

26.     Ballistics evidence proves this second shooter theory was a lie.  After the initial shooter retreated into the building, the only individuals who continued to fire were police officers.  An NYPD crime scene expert gathered extensive evidence from the location, which he photographed, documented and preserved.  Every piece of the ballistics evidence recovered at the scene, which included 25 shell casings, was found on the sidewalk where the officers and the initial shooter were firing.  No bullets or casings were found inside the yard.  If the defendants' theory was true, there would have been ballistic evidence, such as spent shell casings, inside the yard.  All the guns that were fired that night, were fired from the sidewalk outside the yard.

27.     The lack of ballistics evidence in the yard is not the only evidence that reveals the officers' fabrications.  All the spent shell casings or misfired rounds found at the scene matched 4 firearms; 3 police weapons and 1 additional firearm.  There were only 4 shooters that night; 3 police officers and the initial shooter.  In addition, despite the officers' claims of firing, and being fired upon, multiple times at a very short range, no one was injured.

**B. The Recovered Firearm**

28.     One firearm was recovered from the crime scene near the front steps leading to the door of the home on the left side of the building.  Mr. Ala was on the sidewalk.  The

officers were positioned on the concrete wall that ran along the front of the property, meaning that they were between plaintiff and where the firearm was found. It would have been impossible for plaintiff to go from the sidewalk, past the defendants, to the front door to drop a firearm without being seen or shot. There was no connection between Mr. Ala and the recovered firearm.

29. Under the officers fabricated theory of a second shooter, the shooter was in the right front area of the yard and was immediately arrested coming down the center walkway. Even under the defendants' theory, there was no connection between this supposed second shooter and the recovered firearm.

30. All spent shell casings that matched the recovered firearm were located on the sidewalk where the initial shooter was firing and the location of recovered firearm was near the front door where the initial shooter retreated. Again, there was no connection between that firearm and Mr. Ala.

31. The defendants, including O'Brien, repeatedly lied and misled investigators, District Attorneys and jurors when testifying about the recovered firearm. Within hours of the incident, O'Brien told investigators that he didn't know where Mr. Ala was arrested. Hours later, he told the Kings County District Attorney's Office that he arrested Mr. Ala and the gun was found near him. When interviewed again months later, O'Brien stated that the gun was found in the grass right next to Mr. Ala. He claimed it was where Mr. Ala dropped it. Defendant police officers fabricated evidence and misrepresented the facts to connect plaintiff to that recovered firearm knowing that no connection existed.

32. In addition to lying about the connection between Mr. Ala and the location of the firearm, O'Brien lied to the jury about actually being able to identify the recovered

7

firearm as the one used by a second shooter. O'Brien could not have seen the supposed second shooter's firearm because there was no second shooter. O'Brien also could not have seen the firearm being held by this fabricated second shooter because the shooter was supposedly behind a wall, hiding in the bushes in the dark, while O'Brien described himself as "taking cover".

**C. Statements to Police**

33. When Mr. Ala was rounded up with the other innocent witnesses, he asked why he was being arrested. That was the only statement he made.

34. When first interviewed by NYPD investigators, the defendant officers wrongly attributed several statements to Mr. Ala. These statements were essentially "I hate cops" and "I don't have a gun". In the months that followed, these statements morphed into dramatically more threatening and inculpatory statements. Defendant O'Brien testified that Mr. Ala said "I should of killed you (expletive)…". Defendant Strobert testified that Mr. Ala stated "I should have killed you cops." Defendant Broughton testified that Mr. Ala stated "I wish I killed you cops". Each of these fabricated statements were used by the prosecutors to pursue these charges and ultimately secure Mr. Ala's wrongful conviction. Mr. Ala did not make the initial more innocuous version of these fabricated statements and he did not make the altered more damaging version of these fabricated statements.

35. At all times during the events described above, the defendant police officers were engaged in a joint venture and formed an agreement to violate plaintiff's rights. The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other

8

during said events. They failed to intervene in the obviously illegal actions of their fellow officers against the plaintiff.

36. During all the events above described, defendants acted maliciously and with intent to injure plaintiff.

## DAMAGES

37. Mr. Ala suffered severe emotional pain and mental anguish as a result of being punished for crimes he did not commit. He was denied effective treatment for his emotional injuries while incarcerated and continues to suffer mental anguish to this day. Plaintiff fears police contact and crowded locations. His everyday activities are limited and disrupted by the traumas he has suffered in this case.

38. Plaintiff's lengthy incarceration also denied him the opportunity to pursue normal relationships or simple companionships with his family and friends.

39. Plaintiff suffered severe economic loss as he was denied employment and income. His earning power and ability to support himself have been permanently undermined by his wrongful imprisonment.

40. Additionally, Mr. Ala claims, *inter alia*, loss of liberty; loss of enjoyment of life; continuing pain and suffering, including post-incarceration psychological issues; lost earnings while incarcerated; impaired earning capacity and limitations on future employment opportunities; emotional distress; humiliation; indignities; embarrassment; degradation; loss of consortium; physical injuries and lack of access to health care while incarcerated; attorneys' fees, and other pecuniary losses; and past pain and suffering; loss of family relationships; and loss of reputation.

41. All the above-described injuries and damages were the direct and proximate result

of the acts of defendants.

## FIRST CAUSE OF ACTION
### 18 USC §1983-Due Process/Denial of a Fair Trial

42. The above paragraphs are here incorporated by reference.

43. Defendants acted under color of law and conspired to deprive plaintiff of his civil, constitutional and statutory rights to due process of law pursuant to the Fifth and Fourteenth Amendments to the United States Constitution and are liable to plaintiff under 42 U.S.C. §1983.

44. Among other acts described above, defendants fabricated their statements to the prosecutor, the Grand Jury and at trial.  Each defendant exaggerated and misrepresented what they saw on the night of plaintiff's arrest, including the existence of a second shooter, the firearm allegedly used by plaintiff, and the location of plaintiff's arrest.  The defendants also knowingly falsified statements allegedly made by plaintiff and conducted suggestive identification procedures, thereby denying plaintiff of due process.

45. Plaintiff was arrested, charged, convicted and incarcerated as a result of the defendants' wrongful acts.

## SECOND CAUSE OF ACTION
### 42 USC §1983-Malicious Prosecution

46. The above paragraphs are here incorporated by reference.

47. Defendants, acting deliberately and with malice, initiated and took steps to continue the criminal prosecution of Mr. Ala without probable cause or other legal justification by fabricating evidence and misrepresenting statements allegedly made by plaintiff.  Probable cause to prosecute did not exist but for the lies, fabrications, and misrepresentations of the defendants throughout the life of the criminal case against Mr.

Ala.

48. Defendants, acting with malice, initiated a prosecution against plaintiff and caused him to be prosecuted in knowing disregard for his constitutional rights.

49. The criminal proceedings were terminated favorably to defendant when the Kings County District Attorney moved to vacate the conviction and dismiss the indictment specifically finding the defendants' testimony unreliable and lacking any credibility.

50. As a direct and proximate result of the misconduct and malicious prosecution detailed above, plaintiff sustained the damages described above.

## THIRD CAUSE OF ACTION
### Municipal Liability

51. The above paragraphs are here incorporated by reference.

52. The City is liable for the damages suffered by plaintiff as a result of the conduct of their employees, agents, and servants, in that, after learning of their employees' violation of plaintiff's constitutional rights, they failed to remedy the wrong; they have created a policy or custom under which unconstitutional practices occurred and allowed such policies or customs to continue, and they have been grossly negligent in managing subordinates who caused the unlawful condition or event.

53. The City has been alerted to the regular use of fabricated evidence and perjury by its police officers but has nevertheless exhibited deliberate indifference to such fabrications; that deliberate indifference caused the violation of plaintiff's constitutional rights in this case.

54. The aforesaid event was not an isolated incident. The City has been aware for some time, from lawsuits, notices of claim, complaints filed with the Civilian Complaint Review Board, and judicial rulings suppressing evidence and finding officers incredible

as a matter of law, that a disturbing number of police officers bring charges against citizens with no legal basis, perjure themselves in charging instruments and testimony, and fail to intervene in and report the obviously illegal actions of his fellow officers. Nevertheless, the City has allowed policies and practices that cause the aforementioned to persist by failing to discipline its officers for perjury or misstatement of evidence.

55. For example, the well documented failures of the Civilian Complaint Review Board ("the CCRB"), a City agency, to substantiate obviously meritorious citizen complaints have gone uncorrected.  The CCRB regularly finds complainants lack credibility based on the fact that such complainants have also brought lawsuits to remedy the wrongs they have experienced, a practice that often results in not substantiating the most serious charges brought to them.  In addition, the CCRB virtually never initiates their own findings of false statements against officers who have made false statements to the CCRB in their own defense, nor do they initiate findings that officers have failed to report their fellow officers' misconduct; thus, officers have no real incentive to come forward, or to testify truthfully at the CCRB.  The CCRB has no enforcement mechanisms once making a finding against an officer; it can only make recommendations to the NYPD, once finding misconduct by an officer.

56. The NYPD, once receiving a substantiated complaint by the CCRB, fails to adequately discipline officers for misconduct.  The NYPD Department Advocate, which is endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized.  Furthermore, in the extraordinarily rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to

reduce the discipline against such an officer, which Commissioner Caban and his predecessors have done on many occasions.

57. Further, the City has no procedure to notify individual officers or their supervisors of unfavorable judicial review of their conduct. Without this notification, improper search and seizure practices and incredible testimony go uncorrected and are condoned. Additionally, according to a report of the New York City Bar Association issued in 2000, the City has isolated his law department from the discipline of police officers, so that civil suits against police officers for actions taken in their capacity as police officers have no impact on the officers' careers, regardless of the outcome of the civil actions. Alan Hevesi, as New York City Comptroller, in 1999 reported that there was a "a total disconnect" between the settlements of even substantial civil claims and police department action against officers.

58. The existence of unconstitutional policies, patterns, practices and/or customs within the NYPD can be further inferred through the conclusions of the July 7, 1994 Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission"), which covered the period of the 1980s as well as the early 1990s. In its highly publicized report, the Commission found that perjury and falsification of evidence was widespread within the NYPD both in documents prepared by officers and in testimony given by officers. Among the report's conclusions was that corruption within the NYPD was "characterized by brutality, theft, abuse of authority and active police criminality."

59. The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights. Despite such notice, the City has failed to take corrective

action and have failed to train, discipline and/or supervise police officers so as to prevent them from fabricating evidence, perjuring themselves, ignoring exculpatory evidence and withholding exculpatory material. This failure and these policies caused the officers in the present case to violate plaintiff's civil rights, without fear of reprisal.

60. Documenting the volume of cases where misconduct by NYPD was uncovered is nearly impossible given that many result in a dismissal or acquittal without a reported decision. But, the unconstitutional policies, patterns, practices and customs of the City, as stated above, may be inferred from even this sampling of cases in which constitutional violations similar to those in the instant case occurred:

   a. People v. Lumpkins, 141 Misc. 2d 581 (Sup. Ct. Kings Co. 1988) (finding that, during 1986 investigation, Brooklyn homicide detective withheld an exculpatory DD5 in bad faith);

   b. People v. Llewelyn, 136 Misc. 2d 525 (Sup. Ct., Kings Co. 1987) (misleading ballistics report presented to the Grand Jury constituted a lie that violated defendant's due process);

   c. People v. Figueroa, 167 A.D.2d 101 (1st Dept. 1990) (vacating conviction because of police officer's reprehensible and false testimony);

   d. People v. Thompson, 71 N.Y.2d 918 (1988) (withholding of Brady material);

   e. People v. Alexander, 136 A.D.2d 332 (1st Dept. 1988) (grand jury testimony that was, at minimum, "misleading and inaccurate," and likely perjurious);

   f. People v. Auletta, 88 A.D.2d 867 (1st Dept. 1982) (conviction vacated because police testimony found to be tailored to nullify constitutional objections);

   g. People v. Miller, 121 A.D.2d 335 (1st Dept. 1986) ("patently tailored" police

testimony);

h. People v. Pantino, 106 A.D.2d 412 (2d Dept. 1984) (police officer lied on witness stand about existence of tape recordings of defendant interview and failed to preserved Brady materials)

i. Maxwell v. City of New York, 156 A.D.2d 28 (1st Dept. 1990) (perjury in connection with 1981 arrest; court found that police officer's sworn statements regarding identification by complainants were "a complete fabrication");

j. People v. Robinson, 133 A.D.2d 859 (2d Dept. 1987) (withholding of Brady material);

k. People v. Lebron, 184 A.D.2d 784 (2d Dept. 1992) (officer's testimony so improbable as to be inherently unworthy of belief);

l. People v. Tejada, 143 A.D.2d 51 (1st Dept. 1988), reinstated, 147 A.D.2d 367 (1st Dept. 1989) (withholding of Brady material);

m. People v. Cardona, 138 A.D.2d 617 (2d Dept. 1988) (withholding of Brady material in Kings County case);

n. Walker v. City of New York, 974 F.2d 293 (2d Cir. 1992) (allowing discovery to proceed under Monell on whether policy of failure to train police officers regarding perjury existed within the NYPD).

61. Plaintiff has been damaged as a result of the deliberate indifference of the City to the constitutional rights of the City's inhabitants.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, as follows:

    A.    In favor of plaintiff in an amount to be determined by a jury for each of plaintiff's causes of action;

    B.    Awarding plaintiff punitive damages in an amount to be determined by a jury;

    C.    Awarding plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

    D.    Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

| Dated: June 5, 2024<br><br>To:<br>City of New York<br>Office of Corporation Counsel<br>100 Church St.<br>New York, NY 10007<br><br>Sergeant Charles Broughton-Retired<br>Detective Sidney Strobert-Retired<br>Police Officer Patrick Coward-Retired<br>Police Officer William O'Brien | Respectfully,<br><br><br>Nicole Bellina<br>Stoll, Glickman & Bellina, LLP<br>Attorneys for Plaintiff<br>300 Cadman Plz. W Fl.12<br>Brooklyn, NY 11201<br>718 852 3710 |
|---|---|

16